UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDIPKUMAR PATEL,

     Plaintiff,

v.

TRINITY HEALTH CORPORATION,

     Defendant.

Case No. 20-10517
Honorable Laurie J. Michelson

---

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

---

In 2017, Sandipkumar Patel, an Indian American, was working for Trinity Health at Home as a physical therapist. That year, Trinity began designating some of its physical therapists as "senior" therapists who would receive more pay. None of the four Indian therapists under Patel's supervisor received the "senior" designation, but three Caucasian therapists and one Asian therapist did. From Patel's perspective, this was the result of race or national origin discrimination; from Trinity's perspective, this was the result of an unbiased application of the criteria for receiving the senior-therapist designation.

In August 2017, Patel met with his supervisor and Trinity's human resources department and questioned why Indian therapists had not received the senior-therapist designation while white therapists had. Less than five weeks later, Trinity fired Patel. From Patel's perspective, his termination was the result of unlawful

retaliation; from Trinity's perspective, Patel's termination was the result of intervening reports of misconduct from two of Patel's patients.

Having discovered what they could about the events, Trinity now asserts that the evidence would not allow a reasonable jury to find that it discriminated on account of Patel's race or national origin or that it retaliated for Patel's complaint of discriminatory promotions. So Trinity asks the Court to award it summary judgment.

Having carefully reviewed the evidence and having considered the parties' arguments, the Court will GRANT Trinity summary judgment for the reasons set out below.

## I. Background

As Trinity Health at Home (Trinity) seeks summary judgment, the Court accepts as true Patel's version of the events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But for context, the following narrative includes some of the accounts of other witnesses.

## A.

Patel is an Indian American. (ECF No. 22-2, PageID.948; ECF No. 20, PageID.270.) In 2003, he earned a master's degree in physical therapy in the United Kingdom. (PageID.257–258.)[1] After immigrating to the United States in 2004, Patel began working as a physical therapist. (*See* PageID.268–269.)

---

[1] Unless otherwise indicated, all "PageID" citations are to ECF No. 20 and the associated exhibits.

In 2013, Trinity hired Patel. (PageID.270.) According to the offer letter, Patel was hired as a "Physical Therapist." (ECF No. 19, PageID.133.) But during the interview, Patel was told that the position was for a "senior" physical therapist. (PageID.273–274, 410–411.)

Patel's daily work involved providing physical therapy at patient's homes. (*See* PageID.287, 326.) Patel made up to 30 house calls a week. (PageID.311, 332.) While at Trinity, Patel had more patients than any other therapist and was told that this was due to his excellent performance. (ECF No. 22, PageID.948.)

In 2016, Trinity was using a pay-per-visit compensation model: the company would pay therapists a set amount for each visit. (*See* PageID.757–758; ECF No. 22, PageID.1023.) In March 2016, Patel received a notice of a pay adjustment for having over 10 years' experience. (ECF No. 19, PageID.204.) Patel recalls receiving the "senior" rate because of his 10 years' experience, credentials, positive patient references, and other considerations. (PageID.340.)

## B.

In 2017, Trinity made two significant changes that affected its physical therapists. For one, Trinity altered its compensation model; for two, it designated some therapists as "senior" therapists. Here are the details.

Sometime around May 2017, Trinity switched from the pay-per-visit model to a salary model. (PageID.385, 741.) According to Patel's supervisor, Karine Pepin, this lowered Patel's total compensation. Pepin recalls, "the pay-per-visit model really helps therapists who love to do volume. . . . [F]or [Patel], because he was used to so

3

much volume with the pay per visit, it was a big difference for him moving into the salaried model[.]" (PageID.760–761.)

Around the time that Trinity switched to the salary model, Trinity also began designating some therapists as "senior." Melody Bartlett, Pepin's supervisor (and thus two levels above Patel), gave a presentation on the designation. (PageID.711, 751.) On the day of the presentation or not long after, Patel had one or more discussions with Bartlett about the senior-therapist criteria. (PageID.410–411; *see also* PageID.394, 427, 752.) During these discussions, Bartlett assured Patel that due to his "credentials, education and work experience" he would "remain" a senior physical therapist. (PageID.410–411, 427.) Indeed, Patel remembers Bartlett telling him that "education, work experience and credentials" were the criteria for deciding who would receive the "senior" therapist designation. (PageID.427, 430.)

But Bartlett was not the person who had created the criteria for the "senior" designation—that was Laura Amenta, Trinity Health at Home's National Director. (ECF No. 23, PageID.1088.) And Amenta had decided that it was not education, work experience, or credentials that mattered. Instead, the criteria included things like consistently filling out patient consent forms and adequately documenting visits. (*See* ECF No. 19-12, PageID.189–190.) And as particularly relevant to this case, to qualify as senior, a therapist needed to timely initiate care 95% or more of the time. (ECF No. 20, PageID.796–797; ECF No. 19-12, PageID.190.) In Pepin's words: "The purpose of . . . the senior therap[ist] designation, was truly to create an incentive for

4

quality . . . and also it would maximize their reimbursements from Medicare as well." (PageID.747.)

Pepin was tasked with applying Amenta's criteria to the 11 physical therapists whom she supervised. (ECF No. 23, PageID.1088.) To complete this task, Pepin pulled reports with her therapists' performance data. (PageID.745–746.) But Pepin recalls that she did not "need to pull all the data for all" her therapists because "some individuals just didn't meet . . . basic criteria, so it was not necessary." (PageID.746.) These basic criteria included "timeliness of care" and "synchronization, so when you get [in] your documentation." (PageID.746.) The basic criteria took four of Pepin's 11 therapists out of the running; this included Patel and two other Indian therapists. (*See* PageID.756; ECF No. 22-2, PageID.948.) When later asked why Patel did not satisfy the basic criteria, Pepin testified that his timely-initiation-of-care score was only 75%, while the criteria required 95% or better. (PageID.797; *see also* ECF No. 23-1, PageID.1089.)

As for the other seven therapists Pepin supervised, Pepin completed the entire senior designation form for Amenta, who was the final decisionmaker on the senior designation. (*See* PageID.744, 749–750, 756.) Of the seven therapists who Pepin fully assessed for Amenta, one was Asian (Aneela Jahangir) and one was Indian (Samina Chaudhry). (*See* ECF No. 20, PageID.453, 756; ECF No. 22, PageID.948.) When Amenta and Pepin sat down and went through the forms "point by point," only four qualified for the senior designation. (PageID.744, 757.) Pepin recalls that two of the seven therapists who did not make the cut "were . . . so, so close, and . . . they just

had minor things. . . . [B]ut Laura Amenta was adamant [that] all the criterias had to be met a hundred percent." (PageID.749–750.) Of the four therapists that Amenta selected as senior, three were white; the fourth was Asian (Jahangir). (ECF No. 20, PageID.453, 472, 591, 757; ECF No. 22, PageID.948, 1068, 1073.) In short then, all four Indian therapists whom Pepin supervised did not receive a senior designation while three white therapists whom Pepin supervised did. (ECF No. 20, PageID.757; ECF No. 22-2, PageID.948.)

## C.

In August 2018, Patel had two meetings with Pepin and people from human resources about why he did not qualify for the senior therapist designation. The first meeting was on August 11, the second August 18. Patel's and Pepin's accounts of each of the two meetings differ.

According to notes Pepin drafted about the August 11 meeting, "[Patel] felt that as a [doctor of physical therapy] holder, he should have automatically qualified [as a senior therapist]. He added that he was aware of some of his colleagues who had received the designation and whom he thought did not deserve it." (ECF No. 19, PageID.221.) Pepin's notes continued, "[I] explained that the criteria identified by our National Director, Laura Amenta were extensive and objective. All were considered based on those criteria and given fair consideration." (ECF No. 19, PageID.221.)

Patel remembers the August 11 meeting differently. He says that he did not tell Pepin that he was a doctor of physical therapy and that he did not claim that he should automatically qualify based on his education. (PageID.433.) Instead, recalls

Patel, he told Pepin that he should qualify for the senior designation because of many factors, including "education, credentials, work experience, [and] patient reference[s]." (PageID.433.) More importantly, Patel recalls asking Pepin why "Indian . . . therapists were not promoted whereas other Caucasian therapists were promoted." (PageID.543.)

Patel further recalls Pepin taking him to Stacie Comiskey in Human Resources, where he also told Comiskey that "[Caucasian therapists] were promoted as a senior physical therapist but none of the Indian origin or Asian physical therapists were promoted as a senior physical therapist even though we have similar or more advanced education, work experience and certificate[s]. And I feel discriminatory about this thing." (PageID.545; *see also* PageID.543.) Patel remembers Comiskey assuring him that they would look into the situation and that she would address the issue with upper management. (*Id.*)

Patel and Pepin also have different accounts of what happened on August 18. According to Pepin's notes, "[I] provided [Patel] with a list of the Senior Requirement Criteria and went over each category and presented a relevant summary of the data available." (ECF No. 19, PageID.221; *see also* PageID.752.) Pepin's meeting notes describe five criteria that, according to her, Patel did not satisfy. (ECF No. 19, PageID.221.) Among the listed criteria was Patel's timely-initiation-of-care score of 75%. (*Id.*) Pepin further wrote, "Sandip disagreed with the data that was presented to him. He felt strongly that the criteria's identified at the National level for the Senior Therapist Designation were wrong. Sandip requested to have a meeting with

Laura Amenta to share his feedback and help them improve this process." (ECF No. 19, PageID.222.)

According to Patel, however, Pepin neither provided him with the senior-therapist criteria nor explained why he did not qualify. (PageID.442–443, 446–447, 605–606.) Patel also recalls that Comiskey was at the August 18 meeting and told him that they did not know the criteria for the senior designation. (PageID.548.) Patel says that after he asked about the education, experience, and credentials of those who had received senior designation, "[Pepin] said maybe this [is a] higher management issue, and she abruptly left the room." (PageID.548; *see also* PageID.594.) Comiskey then took Patel to Kim Keller in human resources. (PageID.542, 548.) Patel told Keller, "I was a senior physical therapist before, I was not promoted or maintained as a senior physical therapist even though I have education, credentials and positive recent reference[s] compared to all other Caucasian therapists who were promoted as senior physical therapist[s]. [Therapists of] Indian or Asian race were not promoted as a senior physical therapist. I feel discriminated." (PageID.548.) At that point, Keller stated that Laura Amenta would address the issue and began drafting an email to Amenta. (PageID.548–549.) Keller advised Patel that Amenta would contact him to set up a meeting. (*See* PageID.441, 548–549.) Although Patel did not see Keller's email to Amenta, he believes that Keller included his complaint about race and national origin discrimination. (PageID.566–569.) Patel's meeting with Amenta was set for September 22, 2017. (PageID.514–515; ECF No. 22-2, PageID.948.)

### D.

Around the time that Patel was questioning Trinity's decision not to award him and other Indian therapists the senior therapist designation, Trinity received two complaints from Patel's patients.

### 1.

On August 14, 2017 (in between the two meetings with Pepin about the senior designation), Patel brought his mother on a patient visit. Patel recalls that prior to doing so, he explained to Pepin that he needed to bring his mother to the doctor and that she would wait in the car while he completed the physical-therapy appointment. (PageID.481.) Patel says that Pepin approved Patel's plan to have his mother wait in the car during the visit. (PageID.481, 484.) Whether Patel's mother ultimately stayed in the car is unclear. (*Compare* PageID.482, *with* PageID.491, 493.)

A week after the visit, Bartlett (Pepin's supervisor) received a phone call from the patient who Patel had visited with his mother. According to Bartlett, "the patient reported that Mr. Patel was never on time" and that "Patel only did exercises with her during four out of the six visits, and did not take any measurements the second week for her discharge." (ECF No. 19, PageID.233.) Bartlett also recalls "[t]he patient complain[ing] that Mr. Patel had a strong body odor and that it took ten minutes or more each time he left her home for [the] odor to go away." (*Id.*) (Patel would later testify that this was a discriminatory comment. (ECF No. 22, PageID.948.)) Bartlett also recalls, "the patient reported that on August 14, 2017, . . . her family member noticed Mr. Patel's mother in the car, so she invited her into the patient's home. Mr.

Patel's mother remained in the patient's home for the rest of the visit." (*Id.*) Bartlett reached out to Pepin (Patel's supervisor) and Keller (HR) and asked them to address the issues raised by the patient with Patel. (ECF No. 19, PageID.234.)

Pepin says she did just that. Pepin recalls Patel explaining that the patient's family member "really insisted" that his mother come into the house, to the point where the family "really got agitated." (PageID.781.) "So then . . . [Patel] decided that it would be okay, because he didn't want to upset the family, to bring his mother in the home." (PageID.781.) Pepin further recalls, "I don't think [Patel] planned it that way, but I got where he was coming from, and we talked about privacy. And I told him you can't do that ever. Not even just leaving your mother in the car. . . . I understood that it was a good learning opportunity and that he would have learned from that and not do that again." (PageID.781–782.) At the time, neither Pepin nor Bartlett disciplined Patel for the incident. (PageID.787–788.)

Patel has a different take. Aside from having obtained prior permission to bring his mother on the trip from Pepin, Patel says Pepin never discussed the incident with him after the patient complaint. According to Patel, the first time he learned that this patient had complained was on the day he was fired. (*See* PageID.491.) In fact, when asked if he ever told anyone at Trinity that his mother did not enter the patient's home, Patel responded, "No, nobody from Trinity has asked about this case." (PageID.496.)

## 2.

Around this time, Patel treated a patient who told him several times during a visit that she did not like his Indian accent; the patient also said that she wanted a new therapist. (PageID.505.) Patel recalls that after the visit, he reported to Pepin that a patient had complained about his accent and was requesting another therapist. (PageID.507, 509.) Patel told Pepin that he felt like this was discrimination. (PageID.510.) But Pepin responded along the lines of "sometimes they have a hard time to understand your accent . . . . [W]e will transfer this patient to another therapist." (PageID.510.) Patel further recalls, "[Pepin] said just for the courtesy, call the patient [and tell her] that the other therapist will have to come." (PageID.507; *but cf.* PageID.790.) Patel says that when he called the patient, he neither questioned her nor was upset about her request for a reassignment. (PageID.516–517, 518–519, 523.)

But on September 22, 2017, Bartlett received a complaint from a patient asserting that after she requested a transfer, Patel called her and pressed her to change her mind. (ECF No. 19, PageID.234.) Bartlett recalls, "The patient explained that Mr. Patel was her Physical Therapist and she had recently requested another Physical Therapist because Mr. Patel was frequently on his phone during their visits." (*Id.*) And, according to Bartlett, "The patient stated that after she made this request, Mr. Patel called her and asked why she called his boss to complain about him. The patient, who was very upset, told me that she felt harassed and intimidated by Mr. Patel." (*Id.*) Bartlett further recalls, "[t]he patient also told me that she felt

11

Mr. Patel was 'pressing' her to change her mind about requesting a new Physical Therapist. The patient, who was elderly and lived alone, stated that she was concerned about her safety because Mr. Patel knew where she lived." (*Id.*)

Bartlett says that upon receiving the call from the patient who felt threatened, she immediately contacted Trinity's human resources department. (ECF No. 19, PageID.235.) "We all agreed that this was a very serious incident and a blatant violation of the Patient Information Handbook, which affords patients the right '[t]o be free from verbal [and] mental . . . abuse.'" (ECF No. 19, PageID.235.) Bartlett, along with human resources, decided to suspend Patel on the day she received the call, September 22. (*Id.*) Bartlett might have also spoken to Pepin prior to suspending Patel. (PageID.776.)

Coincidentally or suspiciously (depending on perspective), September 22 was the very day that Patel was scheduled to meet with Amenta to discuss his concerns about the senior-therapist designations. (ECF No. 22, PageID.948.) In fact, Patel was heading to his meeting with Amenta when he was notified of his suspension. (*Id.*)

During the suspension, Bartlett consulted with others on how to move forward. (ECF No. 19-16, PageID.235.) Bartlett informed human resources of the earlier, August 14 incident where Patel brought his mother on a patient visit. (*Id.*) And whether before or during the suspension, Pepin recalls, "I was asked to provide . . . any information that I had available about two incidents that occurred. And I provided that information. I did have a discussion with Melody Bartlett as well, and when it came to my input about termination or not, like, to me as a licensed

12

professional, a violation of patient rights and ethics, . . . that's really big." (PageID.775.) Trinity might have also called some of Patel's patients. Patel recalls that during his suspension, "patient[s] were calling me and saying, Sandip, the company was calling and finding it out about you." (PageID.555; *see also* PageID.487.) Neither Pepin nor Bartlett ever asked Patel his side of the story. (PageID.788; *see also* PageID.513–514.)

Had they asked, Patel would likely have told them what he has testified to in this case. First, according to Patel, the patient that reported feeling harassed was the very patient who had complained about his accent; Patel was sure of this because only one of his patients requested a transfer around this time and because he recognized the patient's name. (PageID.518, 520, 522.) Second, Patel says he was not upset when he called the patient to notify her of a transfer; nor did he ask the patient why she requested a reassignment. (PageID.517, 519, 522–523.) Patel explains that there was no reason for him to be upset because it was common for patients to request a different therapist and because he was not paid based on the number of visits. (PageID.524.)

Five days after suspending Patel, on September 27, 2017, Bartlett and "corporate Human Resources" decided to terminate Patel's employment. (ECF No. 20, PageID.564; ECF No. 19, PageID.236.) Bartlett would later explain, "While the call to the patient, standing alone, was a terminable offense, it was even more troublesome when viewed in light of the privacy violation involving Mr. Patel [and his mother] that occurred approximately five weeks earlier."

13

At the termination meeting with Bartlett and Comiskey from HR, Patel was handed a "Corrective Action Notice." (PageID.514.) The notice listed two infractions: "8/14/17: HIPAA Violation—Sandip took family member with him to patient's home for scheduled visit" and "9/22/17: Patient complaint received regarding inappropriate[ ] phone call from Sandip after patient was reassigned to another therapist." (ECF No. 19, PageID.238.) Patel says that when he asked for an explanation for his termination, "they said they had made the decision, that's it." (PageID.511.) Patel recalls attempting to explain that the patient who claimed to feel harassed had an issue with his accent and that he did not make an inappropriate call to her. (PageID.523.) But Bartlett or Comiskey said, "no, you can leave right now." (PageID.523.) Patel was not even allowed to return his equipment to Trinity (PageID.514); "within a minute or less than a minute I was just out . . . the door" (PageID.511).

## E.

Over two years later, Patel filed this lawsuit. Patel's complaint contains seven counts.

Several relate to race or national origin discrimination. Patel asserts that his race or national origin was a motivating factor in Trinity's decision not to designate him a senior therapist, in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1, PageID.12.) He makes a like claim under Michigan's analog to Title VII, the Elliott-Larsen Civil Rights Act, and under 42 U.S.C. § 1981. (*Id.* at PageID.15–17.) Patel also claims that his race or national origin was a motivating factor in Trinity's

14

decision to terminate his employment, in violation of Title VII, ELCRA, and § 1981. (*Id.* at PageID.12, 15–17.)

Several counts of Patel's complaint relate to retaliation. He claims that after he complained that Indian physical therapists were not designated senior while white therapists were, Trinity retaliated by terminating his employment, also a violation of Title VII, ELCRA, and § 1981. (*Id.* at PageID.14–16.)

Finally, Patel asserts that Trinity violated the Bullard-Plawecki Employee Right-to-Know Act by not providing him his employment file in a timely manner and initially providing him with the file of another Indian therapist, Viral Patel. (*Id.* at PageID.18–19.)

The parties completed discovery, and Trinity now seeks summary judgment.

## II. Standard for Relief

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In other words, assuming that a jury would fully credit Patel's testimony and view the evidence in the light most favorable to Patel, Trinity is entitled to summary judgment if no reasonable jury could find in favor of Patel. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. Right-to-Know Act

The Court begins with Patel's claim under the Bullard Plawecki Employee Right-to-Know Act. Generally speaking, the Act prohibits an employer from

knowingly placing false information in the employee's personnel file, grants an employee the right to periodically review his file, and grants the employee the right to "obtain a copy of the information" in the file. *See* Mich. Comp. Laws §§ 423.503–423.504. Because Patel suggests that Trinity's violation of the Act precludes Trinity from using some documents in his personnel file to defend this lawsuit (*see* ECF No. 22, PageID.943–944), this claim is arguably threshold.

Here are the facts supporting this claim. About six or seven months after his termination, Patel requested his personnel file. (PageID.250.) When a month or two passed with no response, Patel sent Trinity a second request. (PageID.250.) Trinity then sent Patel the personnel file of Viral Patel, an Indian physical therapist with the same last name whom Pepin also supervised. (ECF No. 22-2, PageID.948.) Trinity ultimately produced the correct personnel file—but not until after this suit was filed. (PageID.575.)

On those facts, no reasonable jury could find Trinity liable under the Right-to-Know Act.

To start, although the Act requires employers to provide a copy of a personnel file, it sets no deadline for doing so. *See Scuderi v. Monumental Life Ins. Co.*, 344 F. Supp. 2d 584, 603–04 (E.D. Mich. 2004). Trinity claims, and Patel does not dispute, that Trinity produced the file early in this litigation. (ECF No. 19, PageID.107.) So Patel was able to develop his discrimination and retaliation claims in light of its contents. On similar facts, one court found that there is no violation of the Act. *See Scuderi*, 344 F. Supp. 2d at 603–04.

16

And even if Trinity's tardiness amounts to a violation of the Act, a reasonable jury would not award Patel anything for that violation. Unless an employer willfully violates the Act, an employee can only recover "actual damages plus costs." *See* Mich. Comp. Laws § 423.511. Here, there is not sufficient evidence of willfulness: the delay between Patel's first and second request was at most two months and Patel offers nothing indicating that Trinity's production of Viral Patel's file was intentional. As for actual damages, Patel ultimately conceded that he suffered no financial harm from the delayed production of his file. (*See* PageID.576–580.) True, Patel indicates that if Trinity had provided his personnel file earlier, he would have understood the senior-therapist criteria earlier (PageID.573–574) and been able to use his file in his EEOC proceeding (ECF No. 22, PageID.943). But Patel identifies no specific document in his file that would have added support to his EEOC claim beyond information already in his possession.

So, in all, the Court finds that Trinity is entitled to summary judgment on Patel's claim under the Bullard Plawecki Employee Right-to-Know Act.

## IV. Discrimination

The Court thus turns to Patel's claims that Trinity discriminated on account of his race and national origin when it did not designate him a senior therapist and when it terminated his employment.

## A.

The legal framework is a good place to start. As it turns out, Title VII's mixed-motive framework can be used to address all of Patel's claims of discrimination under Title VII, § 1981, and the Elliott-Larsen Civil Rights Act.

Under Title VII, the proper method for analyzing a discrimination claim depends in part on whether there is direct or indirect evidence of discrimination. "Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by unlawful discrimination." *Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019). If there is direct evidence of discrimination, courts do not use the *McDonnell Douglas* burden-shifting framework.

Although fleetingly, Patel suggests he has direct evidence of discrimination. (ECF No. 22, PageID.936–937.) He points out that he told Pepin that one of his patients had complained about his accent, that she had requested a new therapist, and that he felt that the request was discrimination. Patel says that in response, Pepin said, "sometimes they have a hard time to understand your accent . . . . [W]e will transfer this patient to another therapist." (PageID.510.)

Pepin's remark is not direct evidence of discrimination. True, "statements suggesting an employer [took an adverse employment action] because of [the employee's] foreign accent or speech pattern can constitute direct evidence of national origin discrimination." *Igwe*, 790 F. App'x at 34. But here, Pepin's statement was not made in connection with any adverse action—nothing suggests that Pepin's view of

18

Patel's accent influenced the decisions to not designate him "senior" or to terminate him. *Cf. In re Rodriguez*, 487 F.3d 1001, 1009 (6th Cir. 2007) (finding direct evidence of discrimination where employee likely would have been promoted had his current manager not commented on the employee's "accent and speech pattern"). Further, "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). And Pepin's statement was isolated. Because Pepin's statement does not "compel[] the conclusion that unlawful discrimination was at least a motivating factor" in the senior designations or Patel's termination, "it is not direct evidence of discrimination." *Igwe*, 790 F. App'x at 34.

Apart from the direct versus indirect consideration, the proper framework for analyzing a Title VII claim depends on a second consideration. Under Title VII, a plaintiff can pursue two theories: that "the defendant's discriminatory animus, and not some legitimate business concern, was the ultimate reason for the adverse employment action" (a single-motive theory) or that "the defendant's consideration of a protected characteristic 'was a motivating factor for any employment practice, even though other factors also motivated the practice'" (a mixed-motive theory). *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e–2(m)). Here, Patel has pursued both theories. (ECF No. 22, PageID.928, 941.) And that potentially complicates matters. For single-motive claims based on indirect evidence, courts use the *McDonnell Douglas* burden-shifting framework. But for mixed-motive claims based on indirect evidence, courts do not. *White*, 533 F.3d at 400.

19

In this case, it is not necessary to analyze Patel's Title VII discrimination claims using both a single- and mixed-motive framework. The Sixth Circuit has indicated that the mixed-motive route to a jury is less demanding than the single-motive route. *See White*, 533 F.3d at 400–01; *Wallner v. Hilliard*, 590 F. App'x 546, 552 (6th Cir. 2014). And, as will be explained, Patel cannot prevail under a mixed-motive theory. So it follows that Patel cannot prevail under a single-motive theory, either.

In short then, in addressing Patel's claims of discrimination under Title VII, the Court will use the mixed-motive framework set out in *White v. Baxter*.

That leaves the task of selecting the proper framework for Patel's discrimination claims under ELCRA and § 1981.

Under ELCRA, a plaintiff must show that his race or national origin was "a motivating factor" in the employer's decision to take the adverse action. *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520, 522 (Mich. 2001); *but cf. Hecht v. Nat'l Heritage Acads., Inc.*, 886 N.W.2d 135, 146 (Mich. 2016) (providing that a plaintiff must establish but-for causation). So to prevail under ELCRA, Patel must make a showing that is at least as demanding as the one he must make to prove a mixed-motive theory under Title VII.

And the same is true for § 1981. The Supreme Court clarified just last term that "a plaintiff must . . . prove that, but for race, it would not have suffered the loss of a legally protected right," *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020), and, generally, but-for causation is more demanding

20

than Title VII's "motivating factor" standard, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). So if Patel cannot meet the "motivating factor" standard, he cannot show but-for causation for his § 1981 claim.

In short, the standard set out in *White v. Baxter* can be used to address all of Patel's claims of discrimination. That means that this Court must decide whether Patel has "produce[d] evidence sufficient to convince a jury that: (1) [Trinity] took an adverse employment action against [him]; and (2) race, color, . . . or national origin was a motivating factor for [Trinity's] adverse employment action." *White*, 533 F.3d at 400 (internal quotation marks omitted). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.*

## B.

With the framework in place, the Court turns to Patel's claim that his race or national origin was "a motivating factor" in the decision to not designate him as a senior therapist.

No reasonable jury could find for Patel on this claim. To obtain the "senior" designation, therapists needed to have (among other things) a timely-initiation-of-care score of at least 95%. (ECF No. 19-12, PageID.190; ECF No. 20-2, PageID.797; ECF No. 25-3, PageID.1108.) This appears to be an objective criterion. (*See* ECF No. 24-3 PageID.1103, ECF No. 25-3, PageID.1117.) And Pepin twice testified that Patel's timely-initiation-of-care score over the relevant time period was not 95% and that, in

fact, it was about 75%. (ECF No. 20-2, PageID.797; ECF No. 23-1, PageID.1089.) Patel offers no evidence that during the relevant period, his timely-initiation-of-care score was 95% or above. (*See* PageID.424–425.) As Patel's timely-initiation-of-care score was dispositive of whether he would be designated senior, his race or national origin could not affect—or, in Title VII's language, did not "motivate"—the decision not to designate him senior.

None of Patel's arguments to the contrary are persuasive.

For one, Patel argues that he had a better "rollup" or "Overall HHC" score than David Montgomery, a white therapist who received the senior designation. (*Compare* PageID.1062, *with* PageID.1063). While this may be true, it is not evidence of discrimination. Pepin testified that this score was not a criterion for the senior designation. (ECF No. 23-1, PageID.1089.) And Patel offers nothing to the contrary.

Patel also argues that another Indian therapist who Pepin supervised, Viral Patel, had higher scores than white therapists who received the senior designation, yet Viral Patel did not receive the designation. (ECF No. 22, PageID.931.)

This too is not evidence of discrimination. First off, Patel mistakenly cites Jigar Patel's scores when referring to Viral Patel. (*See* ECF No. 22, PageID.931 (citing ECF No. 22, PageID.1065–1067).) Pepin did not supervise Jigar Patel, and in any event, Jigar Patel received the senior designation. (ECF No. 23-1, PageID.1090.) Secondly, Pepin testified that one of the reasons that Viral Patel did not receive the "senior" designation was that "during the relevant timeframe, 33.33% of Viral Patel's visits

were not completed within 24 hours of the time the patient was assigned to him." (ECF No. 23, PageID.1089–1090.) Patel offers nothing to the contrary.

Patel also makes much of the fact that Pepin supervised four Indian therapists, and none received the "senior" designation; in contrast, of the four therapists under Pepin who received the "senior" designation, three were white. (ECF No. 22, PageID.932.)

These disparate results, standing alone, are not probative of race or national origin discrimination. Patel offers no evidence that any of the four Indian therapists that Pepin supervised met the senior-therapist criteria. And Patel offers no evidence that any of the three white therapists that received the senior designation did not meet the senior-therapist criteria. (*See* PageID.457.) Without some evidence that the disparate results were not the result of a correct application of the senior-therapist criteria, the results themselves do not imply race or national origin discrimination.

While that addresses the arguments Patel has made in support of his claim that he was not awarded the senior designation on account of his race or national origin, there is one loose end to tie up. In examining the reports provided by Patel, the Court noticed that Montgomery's timely-initiation-of-care score was only 60%—below Patel's score. (ECF No. 22-12, PageID.1063.) This concerned the Court because Pepin testified that therapists needed timely-initiation-of-care scores of 95% to be designated senior. And if that were true, then how did Montgomery make the cut? So the Court asked for supplemental briefing on this question.

In response, Pepin has provided a second affidavit that clarifies matters. She now explains that in assessing her therapists for the senior designation, she pulled two reports for each therapist: one for June 2016 to April 2017 and one for April to June 2017. (ECF No. 25-2, PageID.1102.) But, says Pepin, she ended up not using the April–June reports because the sample size was too small. (*Id.* at PageID.1103.) As for Montgomery's score of 60%, that was based on the April–June report that she did not use; his score for the June 2016 to April 2017 timeframe was 96.3% (above the 95% threshold for senior). (*Id.*)

That explanation quells the Court's concern, but Patel raises another. Patel points out that in her prior affidavit, Pepin stated that Montgomery's timely-initiation-of-care score was based on the entire year, including April to June 2017. (ECF No. 26, PageID.1122.) But in her latest affidavit, Pepin states that all her therapists' timely-initiation-of-care scores were based on reports covering only June 2016 to April 2017. Patel further points out that during discovery, when he asked for the materials that Trinity relied upon to make the senior designations, Trinity produced both the June 2016 to April 2017 reports and the April to June 2017 reports. (ECF No. 26, PageID.1122.)

No reasonable jury would infer a cover up for discrimination from these inconsistencies. Pepin has explained that she initially pulled the April to June 2017 reports. (PageID.1103.) So Trinity, likely erring on the side of completeness, produced those reports in discovery. Patel has no affirmative evidence showing that Pepin did not evaluate all her therapists based on the June 2016 to April 2017 reports. And

24

more to the point, Patel has not shown that his timely-initiation-of-care score exceeded 95% whether evaluated from June 2016 to April 2017 or June 2016 to June 2017. So the inconsistencies are weak evidence of pretext for discrimination.

To sum up, Patel has not shown that he (or any other Indian therapist supervised by Pepin) satisfied the criteria for becoming a senior therapist, nor has Patel shown that any therapist who received the senior designation did not meet the criteria. As such, no reasonable jury could find that race or national origin was "a motivating factor" in the senior designations. Trinity is thus entitled to summary judgment on Patel's failure-to-promote claims under Title VII, § 1981, and ELCRA.

## C.

Patel also brings a second set of discrimination claims under Title VII, § 1981, and ELCRA: that Trinity terminated his employment in part because of his race or national origin.

No reasonable jury could find for Patel on his discriminatory-termination claim for two reasons: (1) Patel has little evidence that those involved in the decision to terminate him harbored animus toward people from India and (2) to the extent that a reasonable jury could find that someone involved in the termination decision had slight animus, Patel has little evidence that the animus influenced the decision to terminate.

Take the point about animus first. Bartlett was the person who primarily decided that Patel should be fired. (*See* ECF No. 20, PageID.775; ECF No. 19, PageID.236.) Yet Patel has no evidence that Bartlett had any animus toward Indian

therapists. (*See* PageID.476, 528.) Instead, Patel attempts to show that Pepin had animus and that she influenced Bartlett to terminate him. (*See* ECF No. 22, PageID.932, 939 (forwarding a "Cat's Paw" theory).)

So the focus shifts to Pepin. Patel attempts to show that she harbored animus toward people from India in a few ways. He points out that Pepin supervised four Indian therapists, yet none received the senior designation. Patel also directs the Court's attention to an email that he claims shows that Pepin confused him with another Indian therapist, Viral Patel. (ECF No. 22, PageID.926.) Patel also highlights Pepin's comment that "sometimes [patients] have a hard time to understand your accent." (PageID.510.)

Even in combination, this amounts to weak evidence that Pepin was biased against the Indian therapists she supervised.

Consider the senior therapist designations first. As discussed, Patel has no evidence that any of the four Indian therapists met the criteria for being designated senior nor has he shown that any of the white therapists who were designated senior did not meet the criteria. (*See* PageID.457.) And without that evidence, the results of the senior designations do not imply that Pepin was biased against the Indian therapists she supervised.

Take the email next. Contrary to Patel's claim, the email suggests that Pepin did not confuse Patel with Viral Patel. In her email, Pepin asked Patel about a missing consent form. (ECF No. 22, PageID.1060.) In response, Patel stated that he was "aware of it," that he had taken all of the patient's other paperwork and left the

consent form at the patient's home, that he told this to Viral, who was the "therapist and covering this patient," that Viral said he was going on vacation and that "Anika" would take care of it, and that if no one could get the form, he (Sandipkumar Patel) would. (*See* ECF No. 22, PageID.1060.) Far from indicating "you have confused me with Viral Patel," Patel's response to Pepin suggests that she had correctly emailed him, and not Viral, about the consent form.

That leaves Patel's assertion that when he told Pepin that one of his patients wanted a different therapist because of his accent and that he felt that the patient was discriminating, Pepin said something like, "sometimes they have a hard time to understand your accent . . . . [W]e will transfer this patient to another therapist." (PageID.510.) If that was Pepin's response, it may have been insensitive. But the response does not show that Pepin's assessment of Patel as a therapist was diminished because of his accent or that she otherwise viewed him negatively because of his accent. Indeed, by this point, Pepin supervised Patel for well over a year (*see* PageID.350, PageID.701–702), and Patel does not claim that Pepin elsewhere commented on his accent. And Pepin only commented on it in this instance because Patel raised the issue with her. Thus, in the overall context of their employment relationship, it is weak evidence that Pepin was motivated to take any action against Patel on account of his race or national origin.

And even if a reasonable jury could find Pepin had animus toward Indians, little evidence suggests that it affected Bartlett's termination decision.

27

Consider Pepin's actions about one month before Patel was fired. A patient had complained that Patel was "never on time," that he did not always do exercises with her, and that he had brought his mother on a visit. (ECF No. 19, PageID.233.) It is not disputed that, at the time of this complaint, Patel received no discipline. Yet if, as Patel claims, Pepin's animus toward people from India led her to support the very harsh sanction of termination, why did that same animus not lead her to recommend even a mild sanction for a HIPAA violation just a month earlier?

The notion that Pepin's animus (if any) influenced the termination decision is further discounted by the fact that Bartlett was independently concerned about the alleged misconduct. The record reflects that Bartlett was the primary decisionmaker on whether Patel would keep his job. (ECF No. 19, PageID.236; ECF No. 20, PageID.788; ECF No. 23, PageID.1090.) And according to Bartlett, "While it is not unusual for patients to request new caregivers, I had never experienced a situation where the caregiver contacted the patient to challenge the request and attempt to get the patient to change his/her mind. As such, I immediately contacted members of [Trinity Health at Home's] corporate Human Resource Department following my call with the patient on September 22, 2017. We all agreed that this was a very serious incident and a blatant violation of the Patient Information Handbook." (ECF No. 19-16, PageID.235.) In other words, Bartlett—independently—was concerned about Patel's conduct. True, Pepin did offer her opinion on the patient complaint to Bartlett—and she may have done so before Bartlett decided to suspend Patel. (*See* PageID.776, 788–789.) And Pepin "supported" Patel's termination. (PageID.774–

28

775.) But Pepin neither "initiate[d] the decision to terminate" Patel nor "recommend[ed] that he be terminated." (ECF No. 23, PageID.1090.)

Putting everything together, the notion that Pepin's animus toward people from India was a motivating factor in Patel's termination is not reasonable because (1) there is little, if any evidence that Pepin had any animus toward people from India, and (2) to the extent a jury could infer that she had animus, she did not act on that animus when there was an earlier opportunity for discipline, and (3) the primary decisionmaker, Bartlett, was—independently—concerned about the alleged threat that Patel had made to a patient and not unduly influenced by Pepin.

Patel offers a few points in rebuttal, but none would persuade a reasonable jury.

For one, Patel says that after he was fired, Trinity hired several non-Indian therapists. (ECF No. 22, PageID.933.) But Patel offers nothing to suggest that the new hires filled his particular position (as opposed to another therapist's position or simply a workforce expansion). In fact, the therapists identified by Patel were all hired more than seven months after Patel was fired. (ECF No. 22, PageID.1068, 1069, 1071.) Moreover, Pepin supervised three Indian therapists other than Patel, and Patel has not pointed to any evidence that Pepin sought to replace any of them.

For two, Patel argues that a white physical therapist also committed HIPAA violations but was not terminated. (ECF No. 22, PageID.942.) The comparison is not apt. The white therapist's supervisor was not Pepin, the HIPAA infractions involved

texting and emailing patient identifiers, and there is no indication that a patient felt harassed by this therapist. (ECF No. 22, PageID.1075.)

For three, Patel argues that Trinity's two reasons for firing him—the HIPAA violation and his inappropriate phone call to the patient seeking a transfer—lack a basis in fact or, if they have a factual basis, they did not actually motive Trinity's decision to terminate him. (ECF No. 22, PageID.937–940.) In other words, Patel says that Trinity's reasons are pretext for discrimination.

The Court will address these two pretext arguments in the context of Patel's retaliation claims. Patel offers the same two pretext arguments in support of his retaliation claims (ECF No. 22, PageID.937–942) and, unlike the mixed-motive analysis that applies to his discrimination claims, the *McDonnell Douglas* framework applies to Patel's retaliation claims. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008). For now, it suffices to say that even if Patel did not violate HIPAA, and even if Patel did not harass or intimidate a patient, the evidence shows that Bartlett honestly believed that these infractions occurred. And it was that belief (even if incorrect), rather than Patel's race or national origin, that motivated her decision to end Patel's employment. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017).

In short, no reasonable jury could find that "a motivating factor" in Trinity's decision to terminate Patel's employment was race or national origin. Trinity is thus entitled to summary judgment on Patel's discriminatory-termination claims under Title VII, § 1981, and ELCRA.

## V. Retaliation

Having fully addressed discrimination, the Court turns to retaliation. Patel claims that after he questioned whether the senior therapist designations were based on race or national origin, Trinity fired him. Patel asserts that Trinity's retaliation violated Title VII, 42 U.S.C. § 1981, and the Elliott-Larsen Civil Rights Act.

### A.

As with Patel's discrimination claims, the Court begins by putting in place the proper framework for analyzing his retaliation claims. And as before, a single framework can be used to analyze retaliation claims under all three statutes.

Start with the direct versus circumstantial evidence distinction. "[Patel] [has] not present[ed] any direct evidence of retaliation, such as an explicit statement from [Trinity] that it was firing him in response to his discrimination claims." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). And when there is only circumstantial evidence of retaliation, courts use the *McDonnell Douglas* framework to analyze retaliation claims under Title VII, § 1981, and ELCRA. *See Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (Title VII and ELCRA); *B & S Transportation, Inc. v. Bridgestone Americas Tire Operations, LLC*, 758 F. App'x 503, 505 (6th Cir. 2019) (§ 1981).

Further, the causation standard under all three statutes appears to be the same: an employee must show that but for his protected conduct, his employer would not have taken the adverse action.

Indeed, the law is clear that retaliation claims under both Title VII and § 1981 require but-for causation. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII retaliation); *Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (§ 1981 discrimination); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (citing *Comcast* and indicating that § 1981 retaliation claim requires but-for causation).

That leaves ELCRA. True, even after *Nassar*, the Michigan Court of Appeals has continued to state that retaliation claims under ELCRA require a plaintiff to show that the protected conduct was a "significant factor" in the adverse action. *See e.g., Cadoura v. Flat Rock Fire Dep't*, No. 353618, 2021 WL 4238119, at *7 (Mich. Ct. App. Sept. 16, 2021). But it appears that the origin of this "significant factor" language is the Michigan Court of Appeals' decision in *Barrett v. Kirtland Community College*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001). *Barrett*, in turn, relied on a pair of Sixth Circuit opinions: *Jacklyn* and *Polk. See Barrett*, 628 N.W.2d at 70. But *Jacklyn* and *Polk* were both issued before the Supreme Court clarified in *Nassar* that Title VII retaliation claims require but-for causation. Indeed, the Sixth Circuit has recently noted, "Since *Jacklyn* and *Polk*, this court has found that the causation element of Title VII and the ELCRA are the same." *Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 349 n.5 (6th Cir. 2021); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 n.9 (6th Cir. 2019). Accordingly, and having not been provided anything to the contrary from the parties, the Court finds that to prevail under ELCRA, Patel must show that but for raising the issue of discriminatory promotions, he would have

32

kept his job. *See Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014) (reasoning that Michigan courts would interpret ELCRA to require but-for causation).

In short, the Court will apply the *McDonnell Douglas* burden-shifting framework and a but-for causation standard to analyze Patel's retaliation claims under Title VII, § 1981, and ELCRA.

## B.

The *McDonnell Douglas* framework proceeds in three steps: (1) Patel must produce evidence establishing a prima facie case of retaliation; (2) if Patel carries his burden, Trinity must show that it had non-retaliatory reasons for terminating Patel's employment; (3) if Trinity carries its burden, Patel has the opportunity to show that Trinity's alleged reasons for his termination are merely pretext for retaliation. *See Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021). This third step of the burden-shifting framework "merges with the ultimate burden of persuading the court that [h]e has been the victim of intentional [retaliation]." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981); *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) ("[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional retaliation.").

## 1.

To establish a prima facie case of retaliation, Patel must demonstrate the following: "(1) [h]e engaged in protected activity, (2) the defendant was aware of the protected activity, (3) the defendant took an action that was 'materially adverse' to

33

[him], and (4) there is a causal connection between [his] protected activity and the defendant's adverse action." *Jackson*, 999 F.3d at 343–44.

Regarding the second element, Patel argues that there were several ways that Bartlett could have learned of his complaints of discrimination. For one, citing pages 191 and 195 of his deposition transcript, Patel says he testified that he directly talked to Bartlett about the discriminatory promotions. (ECF No. 22, PageID.934.) Patel also points out that Pepin was present at the August 18 meeting where he questioned whether the senior designations were based on race or national origin, and Pepin "briefed" Bartlett on that meeting. (*Id.*) Patel also points out that Comiskey (HR) was present at both the August 11 and 18 meetings, and Comiskey (along with Bartlett) signed his termination paperwork. (*Id.*) Thus, says Patel, "[t]here is ample evidence to create a question of fact as to whether Bartlett was aware of [the] protected activity." (ECF No. 22, PageID.935.)

The Court disagrees. To start, pages 191 and 195 of Patel's deposition transcript simply do not establish that Patel spoke directly with Bartlett about allegedly discriminatory promotions. To the contrary, page 195 states, "I asked them why they are senior and why I am not senior. Q. You asked that to Melody [Bartlett]? A. Not Melody. Who is this, Karine [Pepin]? Q. This was Karine. A. Yes, Karine." (ECF No. 20-1, PageID.434.) And while Pepin did say that she "briefed and updated" Bartlett about the August 18 meeting (ECF No. 20-2, PageID.756), she also said that Patel did not raise discrimination at the August 18 meeting (ECF No. 23-1, PageID.1091; *see also* ECF No. 19-14, PageID.221–222). So when Pepin testified that

34

she "briefed and updated" Bartlett, in Pepin's mind she was not referring to a complaint of discrimination. In any event, fully granting that Pepin heard Patel complain of discrimination at the August 18 meeting and that Pepin briefed Bartlett about that meeting, Patel has no evidence of what, specifically, Pepin told Bartlett. Likewise, as to Comiskey, Patel only has evidence that she advised Bartlett about the termination; Patel has no evidence of what, specifically, Comiskey told Bartlett. And most significant, Bartlett has averred, without contradiction, "I was also never told by anyone at [Trinity], including Ms. Pepin, Ms. Keller, or Stacie Comiskey, that Mr. Patel complained to them about discrimination or differential treatment because of his race or national origin." (ECF No. 19-16, PageID.236.) Accordingly, the Court finds that Patel has not established the second element of his prima facie case.

While that is the end of the story, for the sake of completeness, the Court will consider an alternate ending. In particular, the Court will assume, without deciding that Patel has established a prima facie case of retaliation and proceed to steps two and three of the *McDonnell Douglas* framework. This alternate ending also results in summary judgment.

## 2.

At step two, Trinity must produce evidence that it fired Patel for non-retaliatory reasons.

Trinity has carried its burden. It is not disputed that two patients complained about Patel to Bartlett and that Bartlett was concerned about each complaint. And it is not disputed that the reasons listed on Patel's termination paperwork track those

two complaints: "8/14/17: HIPAA Violation – Sandip took family member with him to patient's home for scheduled visit" and "9/22/17: Patient complaint received regarding inappropriate phone call from Sandip after patient was reassigned to another therapist." (ECF No. 19, PageID.238.) Patel makes no real effort to argue that Trinity has not carried its step-two burden of production. (*See* ECF No. 22, PageID.937.) Thus, the Court finds that Trinity has produced sufficient evidence that it fired Patel for non-retaliatory reasons.

3.

At the third and final step of the *McDonnell Douglas* framework, a plaintiff has the opportunity to show that the employer's proffered reason for the adverse action is pretext for retaliation. Most of the time, a plaintiff attempts to establish pretext in "one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (internal quotation marks omitted). "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*

That last point about the "ultimate inquiry" means that the Court will also consider Patel's evidence of causation at the pretext stage. After all, each piece of evidence that supports Patel's claim that his complaints of discrimination were the

36

but-for cause of his termination undercuts Trinity's claim that patient complaints were the cause of Patel's termination. So the Court considers the parties' evidence of causation and pretext together. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 108 n.2 (6th Cir. 2005) ("The overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason is implicitly recognized in our case law, which permits both to be proven by the same type of evidence."); *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) ("[I]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage.").

Patel attempts to show that his complaints of discrimination led to his termination or that Trinity's asserted reasons for his termination are pretext for retaliation in a number of ways. None are convincing.

Patel claims that Pepin's demeanor toward him changed after the August 18 meeting in a way that suggests an intent to retaliate. (*See* ECF No. 22, PageID.926.) In support of this argument, Patel cites pages 355 and 356 of his deposition transcript. (ECF No. 22, PageID.926.) But a careful review of these pages reveals that while Patel had been testifying about the August 18 meeting where he raised discrimination, the topic abruptly switched to a different meeting, one with Pepin and Barb Rolando in human resources. (*See* PageID.594 ("After Barb had told you to disregard the performance improvement plan in that meeting . . . ."); *see also* PageID.354, 599.) So Patel testified that after the meeting with Pepin and Rolando—

37

not the August 18 meeting—Pepin's demeanor toward him changed. (*See* PageID.594, 599.) And the meeting with Pepin and Rolando occurred in 2016—long before any protected conduct. (*See* PageID.352–355; 843.) So pages 355 and 356 of Patel's deposition transcript do not support Patel's claim of retaliation.

In this vein, Patel also points out that during the August 18 meeting, Pepin stated that Patel's complaint of discrimination was perhaps "a higher management issue" and then "abruptly" left the meeting. (ECF No. 22, PageID.936.) In Patel's view, this also suggests that Pepin wanted to retaliate for his complaint of discrimination. (*Id.*)

Pepin's reaction at that August 18 meeting is weak evidence of retaliation. First, Pepin's testimony indicates that she did not leave because she was upset about Patel's complaint of discrimination specifically, but because the situation was generally tense and because she wanted to allow Patel to discuss the issue with someone else: "[Patel] was very upset, and then I thought . . . I don't know if he's upset, like, at me or—I wanted him to have an opportunity maybe to confide in . . . Kim Keller. Like, if he wanted to talk to Kim Keller about anything . . . that he was not comfortable to talk about with me present." (PageID.754.) Second, under Patel's account, Pepin herself suggested that his complaint was perhaps a "higher management" issue, i.e., she was not trying to keep Patel's complaint from higher management. Third, Patel's complaint was that the Indian therapists who were not promoted had similar or better "education, credentials and experience" than the white therapists who were promoted. (PageID.535; *see also* PageID.534, 543, 545,

38

548, 557, 563–564.) Yet Pepin knew that "education, credentials and experience" were not the criteria for promotion, and thus had little reason to be concerned or upset that Patel had caught her discriminating. And, again, it was Bartlett, not Pepin, who primarily decided that Patel should be terminated.

Patel also attempts to cast doubt on Trinity's stated reasons for his termination by implying that Trinity solicited the two patient complaints. (ECF No. 22, PageID.936, 941.) Patel believes that Trinity "began calling [his] patients one-by-one to look for . . . any problems they may have with [him]." (ECF No. 22, PageID.948.) Patel explains, "My belief is based on the fact that multiple patients of mine called me directly and told me that the office had called them asking them questions about me, searching for anything negative." (*Id.*; *see also* PageID.552, 558, 562.)

Fully accepting that Trinity called some of Patel's patients, there is little evidence that the two particular complaints that led to Patel's termination were the result of Trinity's calls. Indeed, Patel says that he received calls from patients during his suspension. (PageID.487, 555–556, 558–560, 563.) But at that point, there were a host of reasons for Trinity to call Patel's patients that had nothing to do with his protected conduct (e.g., rescheduling appointments). In any event, Patel admitted that he did not know whether Trinity had called the two particular patients who lodged complaints against him. (*See* PageID.487, 555–556, 558.) In fact, there is evidence that the second patient call happened organically. Patel says that after he told Pepin that a patient had complained about his accent and wanted a different therapist, Pepin asked him to call the patient; Patel admits he called the patient

(albeit, in a non-harassing manner). (PageID.507, 518.) So it was Patel's call to the patient, rather than Trinity's efforts to dig up something negative, that led to the September 22 complaint. In all then, a reasonable jury could not infer that Trinity's calls to Patel's patients are what prompted the August 21 and September 22 complaints about Patel.

Patel also suggests that timing supports his retaliation theory. (ECF No. 22, PageID.935.) He points out that he was suspended on the very day he was set to meet Amenta to discuss his concerns about the senior-therapist designations. Indeed, Patel was on his way to meet Amenta when he was informed of his suspension. (ECF No. 22, PageID.948.)

This was mere coincidence. There is no dispute that on the day that Patel was to meet with Amenta, a patient called Bartlett and reported feeling harassed and intimidated. And, as just discussed, that September 22 call was not solicited by Trinity. (PageID.507, 518.) As such, the fact that it came on the same day that Patel was to meet with Amenta is not suspicious.

Sticking with timing, Patel points out that he was terminated just four or five weeks after questioning why no Indian therapists were designated as senior. In his view, this close temporal proximity suggests retaliation. *See also George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (providing that close temporal proximity is, on its own, sufficient to establish causation at the prima facie stage of *McDonnell Douglas*).

40

In this case, the close temporal proximity is weak evidence of retaliatory motive. To start, Patel's reliance on temporal-proximity overlooks the fact that there were two, significant intervening events between his protected conduct and his termination: the patient complaint on August 21 and the patient complaint on September 22. Relatedly, Patel's temporal-proximity argument also overlooks the fact that there was a point in time even closer to his protected conduct than his termination, where Pepin or Bartlett could have retaliated, but did not. On August 21, a patient complained to Bartlett that Patel was late to appointments, did not always do exercises with her, had a strong body odor, and brought his mother into her house. (ECF No. 19, PageID.233.) This complaint was after Patel's protected conduct on August 11 and 18. Yet it is undisputed that neither Pepin nor Bartlett disciplined Patel for the August 21 complaint.

Patel also finds it suspicious that he initially received no discipline for the alleged HIPAA violation, but then, a month later, the violation was listed as one of only two grounds for his termination. (ECF No. 22, PageID.939.)

But the record shows that there was nothing inconsistent about Trinity's handling of the HIPAA violation. Pepin explains, "I thought . . . [the first incident,] that's a huge lapse of judgment, but . . . I was a satisfied with my conversation with [Patel about it]. . . . The second violation, now we were in complete breach of ethics and patient right, and it's a big violation. And . . . when I look at the big picture and I see the lapse of judgment and now this big breach, this violation, I do think that . . . it's a strong support in termination." (PageID.787.) Bartlett similarly explains:

41

"While [Patel's] call to the patient, standing alone, was a terminable offense, it was even more troublesome when viewed in light of the privacy violation involving Mr. Patel that occurred approximately five weeks earlier." (ECF No. 19, PageID.236.) In other words, the combination of patient complaints created the bigger problem. So the fact that Patel initially received no discipline for the HIPAA violation but then it was later cited as grounds for termination is not, as Patel suggests, evidence of pretext for retaliation.

Patel also claims that there was, in fact, no HIPAA violation. (ECF No. 22, PageID.938–939.) Patel says that the patient's family member *invited* his mother into the home, and so the patient consented to his mother's presence. (*Id.*) And, says Patel, because there was no HIPAA violation, its inclusion as a basis for termination is pretextual. (*Id.*)

But even assuming a family member can waive the patient's HIPAA rights, demonstrating that an employer's stated reason lacks a factual basis does not give rise to an inference of retaliation when the employer honestly believes its stated reason. If the employer believes that there was misconduct, and that belief is based on "particularized facts," then it is that honest belief, rather than retaliation, that motivated the adverse action. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017).

The evidence shows that Bartlett and Pepin honestly believed that the patient's privacy had been violated and that their belief was based on particularized facts. It is not disputed that Bartlett received a call from a patient stating that Patel

42

had brought his mother on a visit and that the patient's family member invited his mother into the home. And right after receiving that call, Bartlett wrote in an email to Pepin, "We need to do a follow up with Sandip to share our expectations regarding timeliness and not taking family with him to visits. (While Mother was left in the car the patient's family member *invited* her in so as to not stay in car during the visit)." (ECF No. 19, PageID.237 (emphasis added).) So Bartlett knew that Patel's mother had been "invited" into the home by a family member. Even so, she was concerned enough about the incident to have Keller in HR or Pepin discuss the issue with him. As for Pepin, she also explained, albeit after Patel was fired, that "[i]t's a violation of patient privacy. The address of a patient is considered a privacy issue." (PageID.778; *see also* PageID.787.)

True, Trinity would not be entitled to the benefit of the honest-belief rule if Pepin's and Bartlett's belief that there was a HIPAA violation was patently wrong. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (providing that if employer's error is "too obvious to be unintentional," the employer is not entitled to the benefit of the honest-belief rule). But Patel has not made that showing. He merely cites to a general description of HIPAA: "[HIPAA] is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed *without the patient's consent or knowledge*." (*See* ECF No. 22, PageID.939.) This very general language does not make clear that there is no HIPAA violation when a patient's family member invites a third party into the patient's home. So if Pepin and Bartlett were mistaken about there being a

HIPAA violation, their mistake was reasonable. Thus, Trinity is entitled to rely on the honest-belief rule.

Patel also asserts that Trinity's second basis for termination—that a patient called and said that she felt harassed and threatened by Patel—lacks a factual basis. According to Patel, although he called the patient, he was not angry and did not question her about requesting a new therapist. (PageID.518–519.) Patel says that he had no reason to be upset as patient transfers were routine, and, at that time, he was not paid on a per-visit basis. (PageID.524.)

But, again, whether Patel actually harassed and intimidated a patient is not the key question; the key question is whether Bartlett and Pepin honestly believed that Patel had harassed and intimidated a patient. And the answer to this key question is "yes." The record shows that Bartlett received a call from an elderly patient stating that she felt harassed and intimidated and that she was concerned for her safety. (ECF No. 19, PageID.234.) Bartlett had little reason to doubt the patient. Bartlett then shared the patient's concerns with Pepin. (PageID.789.) Pepin had no reason to doubt Bartlett. And, according to Patel, neither Bartlett or Pepin ever discussed the complaint with him (PageID.496, 513–514, 523), so all along the way, both Pepin and Bartlett had no reason to doubt the patient. Thus, even granting that Patel did not harass or intimidate the patient, it remains that Pepin and Bartlett honestly (even if mistakenly) believed that he did.

Finally, the Court turns to Patel's strongest evidence that Trinity fired him because of his protected conduct: the fact that Trinity never got his side of the story.

Given the length of Patel's employment and his positive track record, Trinity probably should have obtained Patel's account.

Indeed, an employer is not permitted to claim that it honestly believed in its reasons for termination when that belief is based on a shoddy investigation. *See Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 960 (6th Cir. 2014). An employee can discredit an employer's alleged honest belief by "showing that the employer's decision-making process was not 'reasonably informed and considered' and is thus not worthy of belief." *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 453 (6th Cir. 2016).

As an example, consider *Yazdian v. ConMed Endoscopic Technologies, Inc.* There, Reza Yazdian worked for ConMed and had a rocky relationship with his supervisor, Tim Sweatt. 793 F.3d 634, 640 (6th Cir. 2015). Eventually the two had a heated conversation where Yazdian lodged numerous complaints about Sweatt, including that Sweatt had created a hostile work environment. *Id.* at 641. After Sweatt relayed Yazdian's remarks to his boss and human resources, ConMed issued Yazdian a written warning for "unacceptable conduct/behavior." *Id.* at 642. The warning came without getting Yazdian's side of the story. *See id.* When Sweatt called Yazdian to inform him of the written warning, the two got into another heated conversation where Yazdian again made complaints about Sweatt, some relating to discrimination. *See id.* at 642. Although ConMed's human resources permitted Yazdian to explain the situation, they "warned him not to complain about Sweatt [or Sweatt's boss] in his rebuttal because that would be cause for immediate

45

termination." *Id.* at 643. Yazdian later sent a rebuttal to the written warning, but neither human resources nor Sweatt's boss ever read it. *Id.* at 643. Ultimately, ConMed fired Yazdian for "prior behavioral issues" and being "combative" when he received his written warning. *Id.* at 644.

On those facts, the Sixth Circuit found that the employer could not rely on the honest-belief rule. *Yazdian*, 793 F.3d at 654. No one at ConMed had interviewed Yazdian before the written warning, and no one read his rebuttal to the warning. *See id.* Further, human resources did not permit Yazdian to complain about Sweatt when they asked for Yazdian's account, despite knowing that Yazdian had accused Sweatt of discrimination. *See id.* Because "[t]he record suggest[ed] that ConMed chose to terminate Yazdian based solely on Sweatt's account of the events," its belief that Yazdian had "prior behavioral issues" and was "combative" could not be honestly held. *See id.*

But an employer need not always interview an employee to have an honest belief that the employee committed misconduct. In *McConnell v. Swifty Transportation Inc.*, Mark McConnell drove gasoline tankers for Swifty Transportation and had applied for short-term disability. 198 F. App'x 438, 440 (6th Cir. 2006). Evonne McHugh, who worked for the disability-benefits company, called McConnell to tell him that his benefits would not extend beyond a certain date. *Id.* According to McHugh, this upset McConnell and he threatened to personally pay her a visit with his gasoline tanker. *Id.* After the call, McHugh reported the threat to someone at Swifty who relayed the threat to Swifty's president, Don Smith. *Id.*

"Within minutes," Smith called McHugh and assured her that she had nothing to worry about because McConnell would no longer be working for Swifty. *Id.* Although a Swifty manager subsequently called McConnell to get his side of the story, the Sixth Circuit suggested that Smith could have honestly believed the threat even if he had not talked to McConnell: "McConnell claims that the decision to fire him was made solely upon [Smith's] one conversation with McHugh and without first questioning him as to the validity of the claim. Assuming this is true, that does not mean that Mr. Smith's belief was not honestly held." *Id.* at 444.

Here, although Trinity did not question Patel about whether he had harassed or intimidated a patient, Trinity had enough information to honestly believe that misconduct had occurred. Unlike in *Yazdian*, where ConMed was aware that Yazdian had accused his supervisor of unlawful discrimination, and thus, ConMed had good reason to question the supervisor's motivations, Bartlett had little reason to question the motivations of the patients that called her. So it was much more reasonable for Trinity to take the patients' complaints at face value than for ConMed to take Sweatt's account at face value. Further, Bartlett did not immediately terminate Patel upon receiving the complaints. In fact, the first complaint resulted in no discipline. As for the second, Bartlett consulted with Trinity's human resources and obtained Pepin's opinion before deciding to terminate Patel. In short, while Trinity probably should have asked Patel for his account, an employer's investigation into misconduct need not be ideal for it to honestly believe that the misconduct occurred. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) ("an 'optimal'

investigation—i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule"); *Smith v. Chrysler Corp.*, 155 F.3d 799, 807–08 (6th Cir. 1998) ("In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.").

In all then, there is weak evidence of a causal connection between Patel's complaints of discrimination and his termination and, looking at the other side of the coin, weak evidence that Trinity did not honestly believe the two patients who complained about Patel. Thus, no reasonable jury could find that had Patel not complained of discrimination, he would have kept his job. Trinity is entitled to summary judgment on Patel's retaliation claims under Title VII, § 1981, and ELCRA.

## VI.

For the reasons given, the Court GRANTS Trinity's motion for summary judgment. This case is dismissed.

SO ORDERED.

Dated: October 20, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE